UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE NO. | 04-32927 (LMW) |
| R.J. PATTON CO., INC., | ) | CHAPTER | 7 |
| DEBTOR. | ) | | |
| ROBERTA NAPOLITANO, TRUSTEE, | ) | | |
| PLAINTIFF | ) | ADV. PRO. NO. | 05-3063 (LMW) |
| vs. | ) | DOC. I.D. NO. | 1 |
| VIBRA-CONN, INC., | ) | | |
| DEFENDANT. | ) | | |

## APPEARANCES

Irve J. Goldman, Esq.                                          Attorney for Plaintiff/Trustee
Jessica Grossarth, Esq.
Pullman & Comley, LLC
850 Main Street
P.O. Box 7006
Bridgeport, CT 06601-7006

James E. Townsend, Esq.                                   Attorney for Defendant
140 Willow Street
Suite 4
Winsted, CT 06098

## MEMORANDUM OF DECISION

Lorraine Murphy Weil, United States Bankruptcy Judge

In this adversary proceeding, the chapter 7 trustee (the "Trustee") for the above-referenced debtor's (the "Debtor") estate seeks avoidance of certain transfers (the "Transfers") and recovery of

$23,871.54 (plus interest and costs) as preferences paid to the above-referenced defendant (the "Defendant") involving, *inter alia,* three checks made payable to the Defendant and the Debtor jointly. The court has jurisdiction over this adversary proceeding as a core matter pursuant to 28 U.S.C. §§ 1334 and 157(b), and that certain Order dated September 21, 1984 of the District Court (Daly, C.J.)[1] This memorandum constitutes the findings of fact and conclusions of law mandated by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.     BACKGROUND

The Debtor commenced this chapter 7 case on June 18, 2004. (*See* Case Doc. I.D. No. 2.)[2] Roberta Napolitano, Esq. is the Trustee. The Trustee commenced this adversary proceeding under 11 U.S.C. §§ 547 and 550(a)[3] by the filing of a complaint (A.P. Doc. I.D. No. 1, the "Complaint") on April 7, 2005. The Defendant filed its answer (A.P. Doc. I.D. No. 7, the "Answer") on May 10, 2005. The Answer denied certain material allegations of the Complaint but did not allege any affirmative defenses under Bankruptcy Code § 547(c). (*See* Answer.)

The trial (the "Trial")[4] on the Complaint was held on November 28, 2005. At the Trial, the Trustee introduced her own testimony and the testimony of the Debtor's principal, Robert Patton.

---

[1]   That order referred to the "Bankruptcy Judges for this District" *inter alia* "all proceedings . . . arising under . . . Title 11, U.S.C. . . . ."

[2]   References herein to the docket of this chapter 7 case are in the following form: "Case Doc. I.D. No. ____." References herein to the docket of this adversary proceeding are in the following form: "A.P. Doc. I.D. No. ___."

[3]   References herein to title 11 of the United States Code or to the Bankruptcy Code are references to the same as they appeared prior to the effective date of their amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

[4]   References herein to the transcript of the Trial appear in the following form: "Transcript at ___:____."

The Defendant introduced the testimony of Timothy King, the Defendant's president. Both parties introduced documentary evidence into the record at Trial.[5] The Trial record subsequently was supplemented pursuant to a certain evidentiary Stipulation (A.P. Doc. I.D. No. 28, the "Stipulation"). Post-Trial briefing has been had[6] and the matter is ripe for decision.

## II.   FACTS[7]

Some time prior to the petition date, FIP Construction, Inc. ("FIP"), as prime contractor, entered into the following construction contracts (the "Contracts") with the following owners (collectively, the "Owners"): (a) a contract with Wesleyan University for a project (the "Wesleyan Project") generally referred to as "Center for Film Studies;" (b) a contract with Quinnipiac University for a project (the "Quinnipiac Project") generally referred to as "Development & Public Affairs Building;" and (c) a contract with The Elim Park Baptist Home, Inc. for a project (the "Spring Meadow Project," collectively with the other two projects, the "Projects") generally referred to as "Spring Meadow." (*See* Stipulation (Trustee Exh. 21, 22, 23).) Subsequently FIP entered into the following subcontracts (collectively, the "Subcontracts") with the Debtor (as "mechanical

---

[5] References herein to the Trustee's Trial exhibits appear in the following form: "Trustee Exh. ___." References herein to the Defendant's Trial exhibits appear in the following form: "Defendant Exh. ___."

[6] The Defendant filed a responsive brief (A.P. Doc. I.D. No. 41) on February 9, 2006. Pursuant to an order entered after notice and a hearing and dated April 13, 2006 (A.P. Doc. I.D. No. 48) that brief was stricken from the record for the Defendant's counsel's failure to comply with this court's administrative procedures (*i.e.,* electronic filing of documents). Nevertheless, this court has considered that brief.

[7] The facts found below and elsewhere in this memorandum are found on the basis of the Trial record and/or the entire record of this adversary proceeding and chapter 7 case. Except as otherwise indicated herein, outstanding evidentiary objections hereby are resolved in favor of the Defendant.

subcontractor")[8]:  (a) Subcontract dated May 21, 2003 with respect to the Wesleyan Project; (b) Subcontract dated June 3, 2003 with respect to the Quinnipiac Project; and (c) Subcontract dated April 9, 2003 with respect to the Spring Meadow Project.  (*See* Stipulation (Trustee Exh. 21, 22, 23); Transcript at 9 (testimony of Mr. Patton).)  Subsequently, the Debtor entered into agreements (either by purchase orders or otherwise, the "Supply Agreements") with the Defendant pursuant to which the Defendant agreed to supply certain materials and/or services for each of the Projects for certain consideration to be paid by the Debtor.  (*See* Transcript at 29-30 (testimony of Mr. King).)

The Defendant performed under the Supply Agreements and issued the following invoices to the Debtor: (a) an invoice dated November 17, 2003 (with a "ship date" of October 17, 2003) with respect to the Wesleyan Project in the amount of $8,082.00 (Trustee Exh. 2); (b) an invoice dated December 15, 2003 (with a "ship date" of December 9, 2003) with respect to the Quinnipiac Project in the amount of $4,800.00 (Trustee Exh. 8); and (c) an invoice (the "Spring Meadow Project Invoice" collectively with the other two invoices, the "Invoices") dated November 17, 2003 (with a "ship date" of November 5, 2003) with respect to the Spring Meadow Project in the amount of $18,120.00[9] (Trustee Exh. 14).

The Debtor fell into financial difficulty in approximately February of 2004.  (*See* Transcript at 8 (testimony of Mr. Patton).)  Around that time, Mr. King (at the Defendant) "contact[ed] . . . [Mr. Patton at the Debtor] to see about . . . [the Defendant's] getting paid for . . . [the Invoices] after so much time had gone by." (Transcript at 32:22-23 (testimony of Mr. King); *see also* Transcript at

---

[8]    The parties have not referred to the terms of the Subcontracts in their arguments and this court will do likewise in analyzing the merits of those arguments.

[9]    The copy of the Spring Meadow Project Invoice in evidence has a typed amount due of $19,207.20 which was corrected by hand to delete a $1,087.20 charge for "Sales Tax."  (*See id.*)

33:2-8 (testimony of Mr. King).) Mr. Patton told Mr. King that "there was some difficulty that . . . [the Debtor] had and that . . . [the Defendant] should contact FIP, that they . . . were offering to negotiate those invoices." (Transcript at 33:10-15 (testimony of Mr. King).) At that time, FIP owed money to the Debtor under each of the Subcontracts which receivables included the amounts owing by the Debtor to the Defendant pursuant to the unpaid Invoices.[10] (*See* Transcript at 12-18) (testimony of Mr. Patton). Mr. King then had one or more "follow-up" conversations with FIP. (Transcript at 34 (testimony of Mr. King).) Those conversations resulted in a meeting between representatives of FIP and the Defendant at FIP's offices on May 12, 2004 (the Debtor was not represented at that meeting). (*See* Transcript at 34-36 (testimony of Mr. King).)

In preparation for that meeting, either FIP or the Debtor had prepared a form of "Joint Pay Agreement[:] Prime Contractor/Subcontractor/Supplier" (each hereafter referred to as a "JPA" and discussed further below) for each of the Projects and, for each Invoice, FIP had issued a check (each dated April 27, 2004, a "Joint Check") made payable jointly to the Debtor and the Defendant in the reduced amounts alleged in Exhibit A to the Complaint. The Debtor had signed each of the JPAs and endorsed each of the Joint Checks at FIP's offices on April 28, 2004 and had left all of the foregoing there. (*See* Transcript at 23 (testimony of Mr. Patton); Transcript at 36-37 (testimony of Mr. King); *see also* Trustee Exh. 3, 9, 15.) Presumably, FIP had prepared the forms of the lien waivers and general releases described below. When Mr. King arrived at FIP's offices on May 12, 2004, the partially executed JPAs, the partially endorsed Joint Checks and the forms of lien waivers and general releases all were waiting for him. (*See* Transcript at 40 (testimony of Mr. King).)

---

[10] The Debtor's rights to payment under the Subcontracts with respect to the Invoices are referred to herein as the "Receivables."

At or before the meeting, FIP's representative told Mr. King that the Defendant could have a seventy-seven cent (77¢) on the dollar payment on the Invoices (*i.e.*, payment in the aggregate amount of the Joint Checks endorsed by the Debtor) if the Defendant would execute and deliver lien waivers and general releases to FIP. (*See* Transcript at 38-39 (testimony of Mr. King).) On behalf of the Defendant, at the May 12, 2004 meeting Mr. King signed the JPAs, executed lien waivers with respect to each of the Projects (as discussed further below), executed general releases of FIP and each of the Owners (as discussed further below) and delivered all of the foregoing to FIP. (*See* Trustee Exh. 3, 9, 15; Defendant Exh. A, B, C.) Mr. King then was given the partially endorsed Joint Checks, took them back to his office and they were deposited into the Defendant's bank account. (*See* Transcript at 39 (testimony of Mr. King).)

III.  **THE JPAs, THE LIEN WAIVERS AND THE RELEASES**

Each of the JPAs provides in relevant part as follows:

"[T]o induce . . . [the Defendant] to furnish the above items,[11] [the Debtor] . . . requests and authorizes . . . [FIP] to issue all applicable payment checks jointly payable to . . . [the Debtor and the Defendant] in the amounts specified in . . . [the Debtor's] billings . . . . No funds will be paid to . . . [the Defendant] in excess of that which is due on this particular job. This agreement to pay by joint check is made solely as an accommodation and is not intended to create in any way a contractual relationship, direct or indirect, between . . . [FIP and the Defendant] and/or any of its subsidiaries. Furthermore, all payment terms as contained in the contract between . . . [FIP and the Debtor] remain in effect.

[The Debtor] shall forward to . . . [FIP] a copy of the invoice from . . . [the Defendant] indicating the joint check amount. All joint checks shall be delivered to

---

[11] The JPAs state that they were executed to induce the Defendant to supply the subject goods and/or services to the Projects. As is apparent from the Trial record discussed in part II, *supra*, that is untrue; the JPAs were executed after the Debtor already had incurred its debt to the Defendant under the Supply Agreements. That conclusion is not barred by the parol evidence rule. *See TIE Communications, Inc. v. Kopp,* 218 Conn. 281, 291 (1991) ("The parol evidence rule pertains to contract terms, not assertions of fact.").

[the Debtor] for endorsement and forwarded to the . . . [Defendant] . . . . This Joint Pay Agreement is not revocable, until all parties agree in writing.

(Trustee Exh. 3, 9, 15).

Each lien waiver (a "Lien Waiver") provides that the Defendant

waived, relinquished, and released and do[es] hereby waive, relinquish, and release all liens and claims of liens we now have or may hereafter have upon . . . [the respective Project] for labor done or to be done and materials furnished or to be furnished in the erection, construction or repair of said . . . [Project].

(Defendant Exh. A, B, C.)

Each general release (a "General Release") provides that the Defendant

remised, released and forever discharged . . . FIP . . . [and the respective Owner], their predecessors, successors, assigns, affiliates, subsidiaries, directors, officers, employees, agents, all related insurers, underwriters, sureties, and financial sources of all listed parties, of and from all, and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckoning, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law, or equity, which . . . [the Defendant] ever had, now has or which it or its successors, subsidiaries and related parties, heirs and assigns hereafter can, shall or may have for, upon or by reason of or in connection with the construction of the . . . [respective Project].

(Defendant Exh. A, B, C.)

**IV.   ANALYSIS**

    **A.   Applicable Law and Standards**

Bankruptcy Code § 547(b) provides in relevant part as follows:

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>    (1)  to or for the benefit of a creditor;
>    (2)  for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
>    (3)  made while the debtor was insolvent;

>    (4) made—
>        (A) on or within 90 days before the date of the filing of the petition . . . ; and
>    (5) that enables such creditor to receive more than such creditor would receive if–
>        (A) the case were a case under chapter 7 of this title;
>        (B) the transfer had not been made; and
>        (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C.A. § 547(b) (West 2005). "Transfer" is defined by the Bankruptcy Code to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property. . . ." 11 U.S.C.A. § 101(54) (West 2005). Bankruptcy Code § 550(a) provides in relevant part:

>    (a) [T]o the extent that a transfer is avoided under section . . . 547 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from–
>        (1) the initial transferee of such transfer . . . .

11 U.S.C.A. § 550(a) (West 2005).

The burden is on the Trustee to prove by a preponderance of the evidence every element of Section 547(b) (including that the property transferred was property in which the debtor had "an interest" within the statutory purview). *See, e.g., Stingley v. AlliedSignal, Inc. (In re Libby Int'l, Inc.)*, 247 B.R. 463, 466 (B.A.P. 8th Cir. 2000); 11 U.S.C.A. § 547(g).

### B. Application of Law to Fact

The Defendant contends that the Trustee has not proved that the Transfers were of "an interest of the [D]ebtor in property" within the purview of Section 547(b) and also contests other elements of a preference to the extent that they necessarily devolve from the foregoing. In furtherance of its position the Defendant argues as follows: (1) the Transfers were not of property

in which the Debtor had an interest pursuant to the doctrine of "earmarking;" (2) the Debtor lacked sufficient control of the Joint Checks to give it a property interest in them within the purview of Section 547(b); and (3) the payment to the Debtor must be deemed to have been a payment of third-party (*i.e.,* FIP's) funds and not a payment of proceeds of the Receivables because FIP had an independent contractual duty to pay the Defendant. The court will consider each argument in turn.

### 1. **Earmarking**

The Defendant argues that there was no transfer of "an interest of the [D]ebtor in property" within the purview of Bankruptcy Code § 547(b) because the Joint Checks were "earmarked" for the Defendant.

> Under the earmarking doctrine, where a third party lends money to a debtor for the purpose of paying a specific creditor, the loan is not a preferential transfer. Instead the third party simply is substituted for the original creditor . . . .
>
> The earmarking doctrine applies *only* where a third party lends money to the debtor for the specific purpose of paying a selected creditor.

*Glinka v. Bank of Vermont (In re Kelton Motors, Inc.)*, 97 F.3d 22, 25, 28 (2d Cir. 1996) (emphasis added; internal quotation marks omitted). The Joint Checks were not the proceeds of a third party loan substituting one creditor for another. Accordingly, the earmarking doctrine does not apply.

### 2. **Lack of Control Over Joint Checks**

The Defendant further argues that, because the Debtor had so little control over the Joint Checks, the Debtor had no "interest" in them for Section 547(b) purposes. That argument might be more persuasive if the JPAs had been executed and delivered outside of the preference period even if the Debtor had endorsed the Joint Checks within it. That is because the Debtor might have been deemed to have transferred its interest in the Receivables pursuant to the JPAs with later

endorsement of the Joint Checks (*i.e.*, the proceeds of the Receivables) a mere formality. *Cf. Herzog v. SunarHauserman (In re Network 90°, Inc.)*, 126 B.R. 990 (N.D. Ill. 1991).[12] Here, however, the Debtor signed the JPAs and endorsed the Joint Checks at the same time and both within the preference period. When the Defendant signed the JPAs and simultaneously accepted the Joint Checks, the Debtor's interest in the Receivables was transferred to the Defendant and that *was* a transfer of property of the Debtor within the preference period. *Cf. Buono*, 119 B.R. at 501 n.1 (trustee prevails on similar theory).

The Defendant argues that the Trustee cannot prevail on the above theory because the Complaint does not specifically seek avoidance of the JPAs, the Trustee's counsel did not refer to the timing of the JPAs until after all the Trial evidence had come in (except for the Stipulation) and the Defendant has been unfairly surprised.[13] In another case that argument might have some appeal. However, as noted above, in this case the execution of the JPAs and the endorsement and delivery of the Joint Checks were so contemporaneous as to constitute one single occurrence. On those facts, the Defendant cannot be unfairly surprised by the Trustee's attack on the JPAs and reference to the

---

[12]     [T]he debtor in [*Dal-Tile Corp. v. Reitmeyer (In re Buono)*, 119 B.R. 498 (Bankr. W.D. Pa. 1990] . . . still had control of the payments it would receive at the beginning of the preference period, and its surrender of control consequently resulted in a diminution of the estate. In this case, however, Network 90° had relinquished its interest in the payments well before the preference period began; accordingly, the transfer of those payments to SunarHauserman did not dissipate the estate.

*Network* at 995 n.4.

[13]     In fact, the Trustee's counsel referred to the timing of the JPAs in his opening Trial statement. (*See* Transcript at 3:17-18 ("[E]ach of the joint pay agreements themselves was executed within the preference period.") (remarks of Attorney Goldman).)

Joint Checks in the Complaint was sufficient notice that the entire transaction (including the JPAs) was under attack. For this court to require the Trustee specifically to seek avoidance of the JPAs in order to prevail on the Complaint would be to take an unduly technical approach which this court declines to do.

### 3. Independent Duty of FIP To Pay the Defendant

Finally, the Defendant argues that FIP incurred an independent contractual duty to pay the Defendant in accordance with the JPAs because the Defendant executed and delivered the Lien Waivers and the General Releases to FIP in reliance upon the JPAs. As a result, the Defendant further argues, the payments by FIP must be deemed to be payments from FIP's own funds rather than from the proceeds of the Receivables.

It is true that, under some circumstances, courts have deemed payments by a third party contractor to a debtor's supplier to be satisfaction of an independent contractual obligation of the contractor to pay the supplier rather than a payment from the debtor's construction receivable. *See, e.g., Shaw Industries, Inc. v. Gill (In re Flooring Concepts, Inc.)*, 37 B.R. 957 (B.A.P. 9th Cir. 1984).[14] This court has some doubts that the *Flooring Concepts* doctrine applies when the construction receivable owing from the third-party is property of the subcontractor's estate and the

---

[14] While it appears that the payments were made by an account debtor of the bankrupt to a creditor of the bankrupt, in actuality, [the general contractor] . . . made a new contract with . . . [the supplier], whereby [the general contractor] . . . agreed to pay . . . [the supplier] directly in exchange for . . . [the supplier's] forbearance to further pursue its lien remedies. [The supplier] . . . furnished independent consideration to . . . [the general contractor] who thereby received the assurance that its [sic] property would be free of a materialman's lien, which . . . [the supplier] had a right to pursue.

*Id*. at 961.

third-party's payment is charged against that receivable. That the subject checks were made payable to the Debtor and the Defendant jointly (rather than solely to the Defendant) is evidence that the payments here were intended to be credited against the Receivables and that is consistent with Mr. Patton's testimony. (*See* Transcript at 13: 2-6; 16:7-16; 18:3-17 (testimony of Mr. Patton).) Moreover, no cogent argument has been made that the Receivables were not property of the Debtor which would have become part of its bankruptcy estate upon filing. *Cf. Flooring Concepts*, 37 B.R. at 961 ("[T]he account ostensibly due the debtor could not have become part of the bankruptcy estate.").

However, the court need not reach that issue because *Flooring Concepts* and cases similar to it are otherwise not factually apposite here. That is because in this case the Defendant did not give up its lien rights against the Projects in reliance on the JPAs and issuance of the Joint Checks but, rather, the Defendant already had forfeited such lien rights by failure to comply with applicable law as of the time it executed the Lien Waivers.[15] Nor did the Defendant relinquish anything meaningful

---

[15] Under Connecticut law, a mechanics lien is not "valid" unless the supplier properly "lodges" with the appropriate town clerk a proper lien certificate within ninety (90) days after the supplier last supplied goods and/or services for the subject property. Conn. Gen. Stat. § 49-34. In his opening statement at the Trial, counsel for the Trustee asserted that the Defendant's lien rights already had lapsed prior to its execution of the JPAs and Lien Waivers. (*See* Transcript at 4:12-13 (remarks of Attorney Goldman).) That assertion was repeated in the Trustee's Post Trial Memorandum of Law. (*See* A.P. Doc. I.D. No. 32 at 12-13.) Neither of those assertions were controverted by the Defendant either at the Trial (*see* Transcript) or in either of its post-Trial briefs (*see* A.P. Doc. I.D. No. 34 at 3-4, A.P. Doc. I.D. No. 41). Moreover, the evidence at the Trial supports the conclusion that, at the time the Defendant executed the JPAs, more than ninety days had expired from the last date the Defendant supplied materials and/or services to any Project (*i.e.*, the respective "ship dates"). (*See* Transcript at 12:19-23; 12:24-25; 15:24 – 16:3; 17:23 – 18:2 (testimony of Mr. Patton); 43:16-20; 44:3-15 (testimony of Mr. King).) There was no evidence that the Defendant had validated its lien rights pursuant to Section 49-34 within the statutory ninety days. Based upon all of the foregoing, the court finds that the Defendant's lien rights in respect of the Projects had lapsed prior to the time the Defendant executed the JPAs, Lien Waivers and General Releases.

to it when it executed the General Releases[16] or when it agreed to take less than the aggregate face amount of the Invoices as a "final settlement."[17]  Accordingly, the Defendant did not meaningfully rely upon the JPAs and issuance of the Joint Checks.[18]  *Cf. Flooring Concepts*, 37 B.R. at 961 (noting that the supplier gave up materialman's liens which "it had a right to pursue").  Therefore, on the facts presented here, the equities do not favor deeming the payment from FIP to be payment from its own funds (rather than from proceeds of the Receivables which were property of the Debtor) as the equities might if there had been meaningful reliance by the Defendant.  For the foregoing reasons, the court finds this particular argument by the Defendant to be unpersuasive.[19]

## V.  CONCLUSION

For the reasons stated above, the court concludes that a transfer of proceeds of the Receivables occurred upon the execution and delivery of the JPAs and endorsement and delivery of

---

[16]  As noted above, the General Releases purported to release FIP and each respective Owner from claims of the Defendant.  The Defendant never had any claims against FIP or the Owners, neither of whom were in contractual privity with the Defendant; the Defendant does not argue otherwise.  The Defendant may have had claims against the Owners' respective properties at one time (*i.e.,* inchoate mechanics' liens) but, as discussed above, those claims lapsed when the period to record those liens expired and that was before the Defendant's execution of the General Releases and the JPAs.

[17]  By accepting that "settlement," all the Defendant "surrendered" was a "20 percent best case . . . distribution [on the Invoices in this case]" (Transcript at 6:15 (testimony of the Trustee)).

[18]  That is not to say that the General Releases and Lien Waivers had no value to FIP.  There may have been a "peace of mind" factor involved and/or the Contracts may have required FIP to deliver those documents to the Owners.  However, value to FIP is not relevant here;  detriment (if any) to the Defendant is.

[19]  The court has considered the Defendant's remaining arguments and finds them to be unpersuasive.  The court has reviewed the authorities cited by the Defendant and finds them to be consistent with its decision, inapposite and/or unpersuasive.

the Joint Checks and such was a transfer of "an interest of the [D]ebtor in property" within the purview of Section 547(b). Based upon the foregoing and upon the Trial record, the court concludes that the Trustee successfully has carried her burden with respect to all elements of Bankruptcy Code §§ 547(b) and 550(a). The Complaint seeks interest and costs. The court exercises its discretion to award prejudgment interest on $23,871.54 from April 7, 2005 at the rate applicable as of such date under 28 U.S.C. § 1961. *Cf. Hirsch v. Union Trust Co. (In re Colonial Realty Co.),* 229 B.R. 567, 577 (Bankr. D. Conn. 1999). The request for costs is granted. Judgment consistent with the foregoing will enter.[20]

Dated: August 30, 2006                                    BY THE COURT

*Lorraine Murphy Weil*
Lorraine Murphy Weil
United States Bankruptcy Judge

---

[20] The Trustee shall file and serve on the Defendant's attorney an itemized application for statutory costs on or before September 15, 2006. Objection to such application, if any, must be filed and served on or before September 29, 2006.